08  1554

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

——————————————————— x

CITY OF TAYLOR GENERAL
EMPLOYEES RETIREMENT SYSTEM,
Derivatively on Behalf of Nominal Defendant
ELI LILLY & COMPANY,

                  Plaintiff,

    vs.

SIDNEY TAUREL, JOHN C. LECHLEITER,
SIR WINFRIED BISCHOFF, J. MICHAEL
COOK, FRANKLYN G. PRENDERGAST,
KATHI P. SEIFERT, GEORGE M. C.
FISHER, ALFRED G. GILMAN, MARTIN S.
FELDSTEIN, J. ERIK FYRWALD, KAREN
N. HORN, ELLEN R. MARRAM, SIR JOHN
ROSE, CHARLES E. GOLDEN, STEVEN C.
BEERING, AUGUST M. WATANABE,
LINDA LAY, ALVA O. WAY, RANDALL L.
TOBIAS, J. CLAYBURN LAFORCE, JR.,
ALAN BREIER, CHARLES M. BEASLEY,
JR., GARY D. TOLLEFSON, and GERHARD
N. MAYR,

                  Defendants,

    and

ELI LILLY & COMPANY,

                  Nominal
                  Defendant.

——————————————————— x

Civil Action No.

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT

WEINSTEIN J

**JURY TRIAL DEMANDED**



U.S. DISTRICT COURT E.D.N.Y.
APR 1 5 2008
BROOKLYN OFFICE

Plaintiff, by its attorneys, alleges for its Verified Shareholder Derivative Complaint, upon personal knowledge as to itself and its own actions, and as to all other matters upon information and belief based upon, *inter alia*, the investigation made by and through its attorneys, as follows:

## NATURE OF THE ACTION

1.      This is a shareholder's derivative action seeking injunctive and other relief on behalf of Eli Lilly & Company ("Lilly" or the "Company"). The action arises from violations of fiduciary duty to the Company by its directors and/or officers. These violations, in turn, have substantially injured the Company.

2.      Lilly is a publicly traded company headquartered in Indianapolis, Indiana. As detailed herein, the Individual Defendants (as defined herein at paragraph 35) approved of or acquiesced to a course of systemic and sustained misconduct that allowed the Company to market anti-psychotic medications for "off label" usage, which caused thousands of individuals to suffer horrific side effects, including the onset of diabetes. Lilly and the Individual Defendants knew of these risks, but ignored them to garner billions of dollars in illegitimate sales for the Company.

3.      The unlawful and systemic course of misconduct by both Lilly and the Individual Defendants spawned massive personal injury lawsuits, governmental investigations, and securities fraud class action litigation. To date, the Company has spent over $1.5 billion to resolve these cases, with many billions more expected to be paid out to aggrieved individuals and governmental agencies.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, exclusive of interest and costs, and the dispute is between citizens of different states. This action is not brought collusively to confer jurisdiction on this Court.

- 1 -

5.    Venue is proper because many of plaintiff's claims arose in this District, and Lilly has suffered and will continue to suffer harm in this District. The Judicial Panel on Multidistrict Litigation has designated this District for the litigation of all Zyprexa personal injury actions. Moreover, a consolidated securities fraud class action pending against the Company and certain Individual Defendants is proceeding in this District.

**PARTIES**

**Plaintiff**

6.    Plaintiff City of Taylor General Employees Retirement System is and has been the owner of Lilly common stock during all times relevant to this action.

**Nominal Corporate Defendant**

7.    Nominal defendant Lilly is a corporation organized under the laws of the State of Indiana, and maintains its principal executive offices at 639 South Delaware Street, Indianapolis, Indiana, 46285. Lilly discovers, develops, manufactures, and sells pharmaceutical products. Lilly manufactures and distributes its products through owned or leased facilities in the United States, Puerto Rico, and 25 other countries, and its products are sold in approximately 140 countries worldwide. Its common stock is listed and traded on the New York Stock Exchange, and as of November 16, 2007, the Company had an equity market capitalization of approximately $58.77 billion.

8.    Lilly's human pharmaceutical products span several areas, including neuroscience, endocrinology, oncology, cardiovascular, and anti-infectives. Some of its best-known drugs are Zyprexa, Prozac, Straterra, Evista, Ceclor, and Cialis. The Company also produces animal health products including several anti-biotics, parasiticides, and livestock feed additives.

- 2 -

**Current Lilly Directors**

9.       Defendant Sidney Taurel ("Taurel") has been the Chairman of the Board of Directors of the Company (the "Board" or the "Board of Directors") since January 1999, its Chief Executive Officer ("CEO") since July 1998, and a director of the Company since 1991. He served as President from February 1996 through September 2005, Executive Vice President of the Company from 1993 to 1996, and Executive Vice President of the pharmaceutical division from 1991 to 1993. Taurel will resign from the Board of Directors effective December 31, 2008. Upon information and belief, Taurel is domiciled in Indiana.

10.      Defendant John C. Lechleiter ("Lechleiter") has been a director of the Company and a member of the Science and Technology Committee of the Board of Directors since 2005. Lechleiter joined Lilly in 1979, and throughout the relevant period he has served in senior executive positions in which he had direct knowledge and responsibility for all matters relating to Zyprexa. In 1993, he was named Vice President of Pharmaceutical Development; he became Vice President of Regulatory Affairs in 1994. By 1996, the year of Zyprexa's first FDA approval, Lechleiter had been named Vice President for Development and Regulatory Affairs. Lechleiter became Senior Vice President of Pharmaceutical Products in 1998, Executive Vice President, Pharmaceutical Products and Corporate Development in 2001, and Executive Vice President, Pharmaceutical Operations in 2004. He was appointed to his current position as President, Chief Operating Officer and director in October 2005. On April 1, 2008, Lechleiter became President and Chief Executive Officer of the Company. Upon information and belief, Lechleiter is domiciled in Indiana.

11.      Defendant Sir Winfried Bischoff ("Bischoff") has been a member of Lilly's Board of Directors since 2000. Bischoff is a member of the Directors and Corporate Governance Committee and Chairman of the Finance Committee. Bischoff served as a member of the Audit Committee from 2000 through 2005, and as Audit Committee Chairman from 2002 through 2005. In addition,

- 3 -

Bischoff has served as Chairman of Citigroup Europe, since April 2000, and stepped into the role of interim CEO of Citigroup on November 4, 2007. Throughout Bischoff's tenure as a Lilly director, Lilly has had commercial banking, capital markets, and indenture trustee relationships between Lilly and various Citigroup banks. Upon information and belief, Bischoff is domiciled in the United Kingdom.

12.    Defendant J. Michael Cook ("Cook") has been a director of the Company since February 2005. Cook has been Chairman of the Audit Committee since 2006, a member of the Finance Committee since 2006, and was a member of the Compensation Committee from 2005 through 2006. Upon information and belief, Cook is domiciled in Connecticut and/or New York and/or New Jersey.

13.    Defendant Franklyn G. Prendergast ("Prendergast") has been a Lilly director since 1995 and has served on the Audit Committee since that time. He has been a member of the Science and Technology Committee and chaired the committee from 1998 to 2006. Prendergast is a Professor of Biochemistry, Molecular Biology, Molecular Pharmacology, and Experimental Therapeutics at the Mayo Medical School and is a director of the Mayo Clinic. During Prendergast's tenure as a Lilly director, the Company has contributed to the various Mayo entities, including Mayo Medical School, Mayo Clinic, and Mayo Foundation. Upon information and belief, Prendergast is domiciled in Minnesota.

14.    Defendant Kathi P. Seifert ("Seifert") has been a member of Lilly's Board of Directors and the Finance Committee since 1995. Seifert has been a member of the Audit Committee since 1998, and has been the Chairwoman of the Public Policy and Compliance Committee (prior to 2003, the Public Policy Committee) since 1998 and a member of that committee since 1996. Upon information and belief, Seifert is domiciled in Wisconsin.

- 4 -

15.    Defendant George M. C. Fisher ("Fisher") has been a director of the Company since September of 2000, and has been a member of the Compensation Committee since that time. He was Chairman of the Directors and Corporate Governance Committee from 2001 until 2008. Fisher was a member of the Science and Technology Committee from 2000 to 2007. Upon information and belief, Fisher is domiciled in Arizona and/or New York.

16.    Defendant Alfred G. Gilman ("Gilman") has been a member of Lilly's Board of Directors since 1995, and since that time has been a member of the Public Policy and Compliance Committee and the Science and Technology Committee. He currently is Chairman of the Science and Technology Committee. Gilman has been a Professor of Pharmacology at the University of Texas Southwestern Medical Center since 1981, and since 2005 has served as Executive Vice President for Academic Affairs and Provost of that institution, as well as Dean of the University of Texas Southwestern Medical School. During Gilman's tenure on Lilly's Board of Directors, the Company has made grants and contributions to the University of Texas Southwestern Medical Center. Upon information and belief, Gilman is domiciled in Texas.

17.    Defendant Martin S. Feldstein ("Feldstein") has been a director of the Company since 2002, has served on the Audit Committee and the Public Policy and Compliance Committee since that time, and currently chairs the Public Policy and Compliance Committee. Since 2005, Feldstein has also served on and chaired the Finance Committee. Feldstein is a professor of economics at Harvard University, and is President and CEO of the National Bureau of Economic Research. During Feldstein's tenure on the Lilly board, Lilly has made grants and contributions to Harvard University and the National Bureau of Economic Research. Upon information and belief, Feldstein is domiciled in Massachusetts.

- 5 -

18.    Defendant J. Erik Fyrwald ("Fyrwald") has been a member of the Board of Directors of the Company since November of 2005. Since joining the Board, Fyrwald has been a member of the Compensation Committee and the Science and Technology Committee. Fyrwald is Group Vice President of DuPont Agriculture & Nutrition. DuPont supplies Lilly with chemicals used in Lilly's pharmaceutical manufacturing operations. Upon information and belief, Fyrwald is domiciled in Iowa.

19.    Karen N. Horn ("Horn") has been a member of the Board of Directors since 1987. Horn has been Chairwoman of the Compensation Committee since 2006, is a member of the Directors and Corporate Governance Committee, and also chaired that committee from 1995 through 2001. Horn is a former member and Chairwoman of the Finance Committee and the Public Policy Committee. Upon information and belief, Horn is domiciled in New York.

20.    Defendant Ellen R. Marram ("Marram") has been a director of the Company since June 1, 2002, and has served on the Compensation Committee and the Directors and Corporate Governance Committee since that time. Marram is currently Chairwoman of the Directors and Corporate Governance Committee. Upon information and belief, Marram is domiciled in Connecticut and/or New York.

**Former Lilly Board Members**

21.    Defendant Sir John Rose ("Rose") was a director of the Company from December 2003 to 2005, and during that time served on the Directors and Corporate Governance Committee and the Finance Committee. Upon information and belief, Rose is domiciled in the United Kingdom.

22.    Defendant Charles E. Golden ("Golden") was a director, Executive Vice President, and Chief Financial Officer of the Company from 1996 until his resignation on April 26, 2006.

Committee and the Directors and Corporate Governance Committee. Upon information and belief, Way is domiciled in New York.

27.    Defendant Randall L. Tobias ("Tobias") was a member of Lilly's Board of Directors from 1986 to 1998 and was Chairman of the Board and Chief Executive Officer of the Company from 1993 to 1998. Tobias also served on the Public Policy Committee and as an "ex officio" member of the Directors and Corporate Governance Committee. Upon information and belief, Tobias is domiciled in the District of Columbia.

28.    Defendant J. Clayburn LaForce, Jr. ("LaForce"), was a director of the Company from 1981 to 1998, and served as chair of the Public Policy Committee and as a member of the Directors and Corporate Governance Committee and the Science & Technology Committee. Upon information and belief, LaForce is domiciled in California.

**Lilly Officers**

29.    Defendant Alan Breier ("Breier") has been Vice President for Medical and the Chief Medical Officer of the Company since August 2003. Breier is a member of the Lilly Research Laboratories policy committee and the Company's senior management council. Breier has held previous positions as clinical research fellow, Zyprexa team leader, and Vice President of Pharmaceutical Products for Lilly. Upon information and belief, Breier is domiciled in Indiana.

30.    Defendant Charles M. Beasley, Jr., ("Beasley") is Chief Scientific Officer, Global Product Safety, for the Company. Upon information and belief, Beasley is domiciled in Indiana.

31.    Defendant Gary D. Tollefson ("Tollefson") is a former President of Lilly's Neuroscience product group. During his time at the Company, Tollefson led the efforts resulting in the launch and/or product lifecycle implementation for several important neuroscience products, including Prozac, Strattera, Symbyax, Cymbalta, and Zyprexa. Upon information and belief, Tollefson is domiciled in California.

- 8 -

32.      Defendant Gerhard N. Mayr ("Mayr") began his career at Lilly in 1979 as a sales representative in West Germany. From 1999 until his retirement in March 2004, Mayr served as Executive Vice President for Pharmaceutical Operation. Upon information and belief, Mayr is domiciled in Germany.

33.      Defendants Taurel, Lechleiter, Tobias, Golden, and Watanabe, are sued not only as directors, but also in their capacities as officers of Lilly, based on breaches of fiduciary duty owed as officers of the Company, and, together with the defendants named in paragraphs 29 through 32, will be collectively referred to herein as "Officer Defendants."

34.      Defendants identified in paragraphs 9 through 28 are collectively referred to herein as the "Director Defendants."

35.      The defendants described in paragraphs 9 through 32 are collectively referred to herein as the "Individual Defendants."

36.      The Individual Defendants, because of their positions of control and authority as directors or officers of Lilly, were able to and did, directly and indirectly, control the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial, and directorial positions with Lilly, each of the Individual Defendants had access to adverse non-public information about the financial condition, operations, and future business prospects of Lilly, including, without limitation, the misconduct that the Individual Defendants caused.

37.      At all material times hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Lilly, and was at all times acting within the course and scope of said agency.

- 9 -

38.    To discharge their duties, the officers and directors of Lilly were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of Lilly were required, among other things, to:

(a)    Manage, conduct, supervise and direct the business affairs of Lilly in accordance with the laws of the State of Indiana, federal law, state and federal rules and regulations and the charter and bylaws of Lilly;

(b)    Neither violate nor knowingly permit any officer, director or employee of Lilly to violate applicable federal laws, rules and regulations and Indiana state law; and

(c)    Refrain from using their status as directors and major shareholders to the detriment of the shareholders and the Company.

39.    In addition to fiduciary duties of loyalty and good faith, the Director Defendants assumed additional duties in connection with their service on certain of the Board's committees of directors. According to the Company's Form DEF 14A Proxy Statement filed with the Securities Exchange Commission ("SEC") on or about March 10, 2008 (the "2008 Proxy"), during 2007, the Company maintained an Audit Committee. Among other responsibilities, the Audit Committee reviews the Company's financial reporting process on behalf of the Board. It has sole authority to appoint (subject to shareholder ratification) and to terminate the engagement of the independent auditors, which report directly to the Audit Committee. As alleged herein, each of the members of the Audit Committee violated their duties as members of that committee in approving of SEC filings that did not fully disclose Zyprexa's dangerous side effects and its secret marketing scheme.

40.    According to the 2008 Proxy, Lilly maintained a Compensation Committee. The Compensation Committee oversees the Company's compensation and establishes the compensation

of executive officers. This committee also acts as the oversight committee with respect to the Lilly's deferred compensation plans, management stock plans, and bonus plans covering executives. In overseeing those plans, the Compensation Committee may delegate authority to company officers for day-to-day plan administration and interpretation, but it maintains all authority for matters affecting the executive officers. The Director Defendants who are/were members of the Compensation Committee violated their fiduciary duties by developing and/or approving of executive compensation plans based on sales and earnings per share, thus discouraging officers of the Company from questioning negative consequences of the off-label use of Zyprexa. By creating a bonus structure based on sales and earnings, the Compensation Committee was aware that the Officer Defendants were improperly motivated to generate sales and earnings per share regardless of the potential negative side effects of Zyprexa.

    41.    According to the 2008 Proxy, Lilly maintained a Public Policy and Compliance Committee. The purpose of this committee is to oversee the processes by which the Company conducts its business so that the Company will do so in a manner that complies with laws and regulations. The Public Policy and Compliance Committee is also charged with reviewing and making recommendations regarding policies, practices, and procedures of the Company that relate to public policy and social, political, and economic issues that may affect the Company. The Director Defendants who are/were members of the Public Policy and Compliance Committee violated their fiduciary duties by approving and acquiescing in the approval of Zyprexa marketing policies in violation of federal and state laws and regulations.

    42.    According to the 2008 Proxy, the Company maintains a Science and Technology Committee that "reviews and makes recommendations regarding the Company's strategic research goals and objectives reviews and makes recommendations regarding the Company's strategic

research goals and objectives." The Director Defendants who are/were members of the Science and Technology Committee violated their fiduciary duties by making recommendations regarding Zyprexa that would have negative consequences for public health and the Company's long-term financial security.

43.     According to the 2008 Proxy, the Directors and Corporate Governance Committee "recommends candidates for membership on the [B]oard and [B]oard committees. The committee also oversees matters of corporate governance, director independence, director compensation, and [B]oard performance." The Director Defendants who are/were members of the Directors and Corporate Governance Committee violated their fiduciary duties by failing to properly oversee the actions of the Board of Directors.

**SUBSTANTIVE ALLEGATIONS**

**Lilly Introduces Zyprexa**

44.     Schizophrenia is a psychiatric disorder. It represents disorganized and bizarre thoughts, delusions, hallucinations, inappropriate affect, and impaired psychosocial functioning.

45.     By the 1980s, Clozapine was being investigated for the treatment of schizophrenia on the theory that it might be more effective and cause less movement disorder than other antipsychotics. Throughout the 1990's Lilly and others introduced drugs attempting to capture the enhanced therapeutic effect of Clozapine without its toxicity and other side effects caused by traditional antipsychotics. Due to its toxicity, Clozapine had very little market share. The emergence of a second generation of atypical antipsychotic drugs included Zyprexa. Clozapine was termed an atypical antipsychotic because it had an "atypical index" when measuring its effect on brain activity in different parts of the brain. It was hypothesized that the different effects by Clozapine on the areas of the brain that control movement would cause less movement disorder than other antipsychotics.

- 12 -

46.     Medical literature dating as far back as the 1950s demonstrates that antipsychotic drugs have the potential to cause diabetes, diabetes-related injuries (*e.g.*, weight gain and hyperglycemia), cardiovascular and cardiovascular complications, and other severe adverse effects. The prevalence of diabetes in patients with schizophrenia increased from 4.2% in 1956 to 17.2% in 1968 due to the introduction of antipsychotics.

47.     Antipsychotics can also cause Parkinsons-like effects. A long-lasting movement disorder, tardive dyskinesia ("TD"), also occurs with prolonged treatment. TD is potentially irreversible and affects all patient populations. The risk of TD and the likelihood that it will become irreversible increase as the duration of treatment and the total cumulative dose of antipsychotic drugs administered to a patient increases. TD, however, can develop after relatively brief treatment periods at low doses. There is no known treatment for TD, although it has been observed to remit, on occasion, upon the cessation of antipsychotic drug therapy.

48.     Due to the implications of triggering TD, the U.S. Food and Drug Administration (the "FDA") advises that antipsychotic treatment should be reserved for patients who suffer from a chronic illness that (a) is known to respond to antipsychotic drugs, and (b) for whom alternative, equally effective, but potentially less harmful treatments are not available or appropriate.

49.     Further, a potentially fatal symptom complex referred to as Neuroleptic Malignant Syndrome ("NMS") is associated with use of antipsychotic drugs, including Zyprexa. Clinical manifestations of NMS are hyperplexia, muscle rigidity, altered mental status, and evidence of autonomic instability (irregular pulse or blood pressure, tachycardia, diaphoresis, and cardiac dysrhythmia). According to the FDA, the management of NMS symptoms should include:

(a)     Immediate discontinuation of antipsychotic drugs;

(b)     Intensive symptomatic treatment and medical monitoring; and

- 13 -

(c)    Treatment of any concomitant serious medical problems for which specific treatments are available.

50.    Although it is not known how Zyprexa works, it can cause weight gain, movement disorders, and other very serious health problems to different degrees.

51.    The FDA approved Zyprexa in 1996 in an oral tablet form to treat adults with schizophrenia at a target dose of 10mg/day. By 2001, the FDA approved Zyprexa in an oral tablet form to treat adults suffering from acute manic episodes associated with Bipolar I Disorder in doses up to 20mg/day. In July of 2003, the FDA approved Zyprexa tablets for the short-term treatment of adults suffering from acute manic episodes associated with Bipolar I Disorder, in combination with lithium or valproate, with recommended doses of 10-20mg/day. In January of 2004, the FDA approved Zyprexa tablets for long-term treatment of adults with Bipolar I Disorder in doses up to 20 mg/day.

52.    The FDA, the United States Pharmacopeia-Drug Information, the DRUGDEX, and the American Hospital Formulary Service Drug Information ("AHFS") support the use of Zyprexa in adult schizophrenic patients only. Neither the aforementioned compendia nor the FDA-approved labeling supports any use of Zyprexa in any other way or type of patient, including children.

53.    A manufacturer may distribute a drug only if the FDA approves it. *See* 21 U.S.C. § 355(a). A manufacturer must show that a drug is "safe for use" for "all conditions prescribed, recommended, or suggested" on a drug's label in order for the FDA to approve it. *See* 21 U.S.C. § 355(d).

54.    A drug is considered misbranded if its label does not contain, *inter alia*, "[s]tatements of all conditions, purposes, or uses for which such drug is intended." 21 C.F.R. §201.5. *See also* 21 U.S.C. §331(a) (prohibiting the introduction of misbranded drugs into interstate commerce); 21

- 14 -

U.S.C. §352(f) (stating that a drug is misbranded if it does not contain "adequate directions for use"). The term "intended" in 21 C.F.R. §201.5 refers to the "objective intent of the persons legally responsible for labeling drugs." 21 C.F.R. §201.128.

55.    When a manufacturer directly advertises a drug for a particular use, that use is considered an intended use. *See* 21 C.F.R. §201.128 ("[I]ntent may, for example, be shown by labeling claims, advertising matter, or oral or written statements by . . . [manufacturers] or their representatives."). Therefore, if a pharmaceutical company advertises uses not on its FDA-approved label, such as defendants' aggressive off-label marketing, the drug is considered misbranded and its distribution in interstate commerce is prohibited. *See* 21 U.S.C. §331(a) and (d). Furthermore, if a manufacturer promotes off-label use indirectly – such as sponsoring continuing medical education courses that promote off-label use of a drug – that off-label use could be considered an intended use (as defined by 21 C.F.R. §201.128) if the manufacturer intended that the drug be used for off-label purposes.

56.    Despite the fact that the FDA had only approved Zyprexa for the uses described above, defendants intentionally and aggressively off-label marketed Zyprexa to doctors with knowledge that off-label marketing was against FDA regulations and established ethical guidelines.

**"Viva Zyprexa"**

57.    As set forth below, defendants engaged in a scheme to pump up off-label Zyprexa usage to generate sales and profits regardless of the efficacy of such usage and the dangerous Zyprexa side effects known to defendants. As discussed below, defendants used several means to effectuate their sales strategy including usage of medical marketing firms, doctors, and ghostwritten publications. In fact, according to published reports, Lilly engaged in a secret internal marketing scheme called "Viva Zyprexa" to promote off-label sales of Zyprexa to individuals who were not suffering from schizophrenia.

- 15 -

58.    Defendants' efforts had their intended effect: Zyprexa sales sky-rocketed between 1997 and 2005:

| Year | Total Sales of Zyprexa (millions of dollars) |
|------|-------------------------------|
| 1997 | 730 |
| 1998 | 1,443 |
| 1999 | 1,885 |
| 2000 | 2,360 |
| 2001 | 3,087 |
| 2002 | 3,689 |
| 2003 | 4,277 |
| 2004 | 4,419 |
| 2005 | 4,202 |

59.    Indeed, Zyprexa has become Lilly's all time best selling drug. As shown above, Zyprexa accounted for $4.4 billion in Company sales in 2004 alone, which accounted for approximately 32% of the Company's revenue during 2004. In 2003, approximately seven million prescriptions for Zyprexa were dispensed and it had become the seventh largest selling drug in the United States by retail sales.

**Medical Marketing Firms' Role in Zyprexa's Promotion**

60.    Third party marketing firms were critical to defendants' illicit scheme to off-label promote Zyprexa. Defendants' marketing strategy called for information regarding non-medically accepted indications and non-medically accepted uses of Zyprexa to be widely disclosed in continuing medical education programs, consultants' meetings, and other programs where doctors could convey information regarding the unapproved off-label use of the drug

61.    *Bona fide* continuing medical education programs and similar educational events are exempt from FDA rules prohibiting off-label promotion because the sponsoring organization – which is often a nonprofit such as a medical school – theoretically is independent and responsible for controlling the program's content. In practice, however, third party medical marketing firms assist

- 16 -

in the production of these programs. These marketing firms, who work at defendants' behest, are the ones actually supplying the content of the programs, as well as selecting the doctors that will present.

62.    Defendants' marketing strategies intentionally corrupted the educational purpose of these events. Instead of accredited institutions planning independent programs and approaching third party vendors and financial sponsors, defendants created turnkey medical programs, with financing already included, and sought "independent" institutions that would promote their respective drugs in the manner defendants instructed.

63.    Defendants, through their supposedly independent vendors and paid doctors, deliberately omitted the following critical information from events they had sponsored:

(a)    Defendants omitted the lack of clinical trial evidence to support Zyprexa's non-medically accepted and non-medically necessary uses;

(b)    Defendants omitted the results of clinical trial evidence demonstrating that Zyprexa was no more safe or effective than less costly, first generation antipsychotics;

(c)    Defendants omitted negative evidence that Zyprexa did not work for non-medically accepted indications or non-medically necessary uses;

(d)    Defendants omitted information that virtually all publications and studies that allegedly supported Zyprexa's non-medically accepted or non-medically necessary use had been initiated and funded by defendants;

(e)    Defendants omitted information that the doctors who were involved in peer selling had been paid substantial subsidies to use defendants' respective antipsychotic drugs on their patients for non-medically accepted or non-medically necessary purposes;.

(f)    Defendants omitted that the information regarding non-medically accepted and non-medically necessary uses Zyprexa was baseless;

(g)    Defendants omitted information that the events were not funded, as advertised, by an "unrestricted" grant from defendants, but that the grants were conditioned upon the participating vendors and sponsoring institutions making presentations that presented the non-medically accepted and non-medically necessary uses of Zyprexa in the most favorable light; and

(h)    Defendants omitted information related to dangerous side effects revealed through defendants' internal research, adverse event reports, and independent research.

64.    Medical marketing efforts by defendants included third party advertisers, proliferation firms and outside consultants such as Creative Street, Inc; Marketplace Management; Lewis & Gore; Harper; Aldephi Research, Millward-Brown Research; GSW; Pramaton, Inc.; Martin Hamblin; Cohn & Wolfe; and Grey Strategic Marketing/Grey Healthcare Group.

**The Role of Doctors in Zyprexa's Promotion**

65.    Another one of defendants' principal strategies regarding the marketing of Zyprexa was to target key doctors to influence their peers. These selected doctors would promote Zyprexa to their peers by:

(a)    Falsely touting the safety and efficacy of Zyprexa for non-medically accepted indications and non-medically necessary uses;

(b)    Claiming that Zyprexa was being appropriately used by other physicians for non-medically accepted indications and non-medically necessary uses;

(c)    Suggesting mechanisms of action that could explain Zyprexa's efficacy, safety profile and use for non-medically accepted and non-medically necessary purposes, even though Zyprexa's mechanism of action are not understood; and

(d)    Falsely claiming that they were privy to non-existent clinical data that would support its non-medically accepted and non-medically necessary use.

66.     To recruit doctors to participate in fraudulent peer selling, defendants identified specific doctors and informed them of the Company's interest in funding research opportunities and clinical trials at their institutions. Doctors who were willing to speak favorably about Zyprexa often received substantial funds in the form of research grants. Defendants recruited doctors at major teaching hospitals to deliver Lilly's respective marketing message to other physicians. This practice is critical and highly successful because doctors, unlike defendants themselves, can communicate formally to other physicians at marketing events or informally to colleagues within a hospital or medical practice without concern for FDA regulation and without the commercial appearance of formal drug company marketing.

67.     As a result, defendants created an explosion in the off-label use of Zyprexa with this practice. Defendants did so by creating the false perception that doctors were using Zyprexa and investigating its efficacy in non-medically accepted and non-medically necessary uses on their own initiative, and not because of defendants' respective marketing activities.

68.     Defendants, principally through their respective medical marketing affiliates, paid these doctors to write journal articles and letters to the editor that favorably discussed non-medically accepted and non-medically necessary uses of Zyprexa. In addition to providing free travel to resorts, free lodging, and free meals, defendants also paid these doctors to give talks at medical education seminars, advisory boards, consultants' meetings, speakers' bureaus and similar events that favorably discussed non-medically accepted and non-medically necessary uses of Zyprexa.

69.     The more favorable a doctor's statements about Zyprexa, the more he or she could expect in the form of speaker fees and research grants. Doctors who refused to deliver a favorable message did not receive additional payments.

- 19 -

**Ghostwritten Publications**

70.    Defendants also generated what appeared to be independent articles relating to the off-label use of Zyprexa. However, defendants hired non-physician technical "ghostwriters" to draft articles related to the off-label use of Zyprexa and the safety and efficacy of Zyprexa compared to first generation antipsychotic drugs. Then, purportedly reputable doctors were paid to serve as the article's authors, without proper attribution to the non-physician technical ghostwriter.

71.    Defendants recruited medical marketing firms to monitor the status of publications and to coordinate and execute the ghostwriting plan. The role played by the marketing firms in assisting the defendants in creating ghostwritten publications was very similar to the role played by marketing firms in the coordination of peer-to-peer marketing events.

72.    Defendants intentionally misrepresented their role in the creation and sponsorship of these publications. Doctors who reviewed these publications were led to believe that the publications were the independent, unbiased research of the authors of the articles. It was never disclosed that defendants had in fact solicited these articles or that they had paid significant sums of money in various forms to the "doctor-authors" to induce them to make favorable statements about Zyprexa.

73.    Even in instances where "doctor-authors" drafted the articles themselves, they did so under the same system of direction and control through which defendants controlled speaker content generally. As incentive, doctors were promised grants and other gifts if their articles reflected favorably. If a doctor attempted to write a negative article, defendants would intervene and have a more favorable draft written. If this failed, defendants would suppress the article or restrict its dissemination.

**Investigations of Zyprexa's Off-Label Marketing**

74.     As early as 2002, accusations began to surface regarding defendants' off-label marketing of Zyprexa to patients where its prescription was inappropriate and possibly dangerous. According to a March 25, 2008 article published in *The New York Times*, in 2002, the "Japanese government ordered Lilly to warn Japanese doctors against giving Zyprexa to people at high risk for diabetes. But Lilly did not add a similar warning to Zyprexa's label in the United States."

75.     Moreover, in March 2004, the United States Attorney for the Eastern District of Pennsylvania began an investigation into defendants' marketing practices concerning Zyprexa. In June 2005, the Attorney General, Medicaid Fraud Unit, of the State of Florida issued a subpoena to Lilly wherein it sought documents relating to Zyprexa's sales and defendants' promotional practices with respect to Zyprexa. By February 2006, the states of West Virginia and Alaska had filed lawsuits accusing defendants, among other things, of promoting and marketing Zyprexa for off-label use. In July 2006, the State of Mississippi also filed a lawsuit against defendants alleging that Company representatives had persuaded Mississippi doctors to prescribe Zyprexa to patients suffering from unapproved conditions such as anxiety, mood swings, and disturbed sleep – all conditions that were never approved by the FDA for treatment by Zyprexa.

76.     In the wake of the mounting state and federal government and regulatory agency investigations into the off-label marketing and promotion of Zyprexa and the concealment of its dangerous side effects, which defendants continued to deny, hundreds of private actions were filed against defendants by patients and their survivors. Furthermore, a massive product liability litigation is currently pending in the United States District Court for the Eastern District of New York, which includes allegations that defendants violated Medicaid best price regulations and violations of the False Claims Act, as well as investigations being conducted by over twenty-five lawsuits filed by states to recover damages relating to Zyprexa. In addition, the Company and certain of its officers

- 21 -

and directors are facing charges of securities fraud stemming from allegations that they violated the Securities Exchange Act of 1934 for disseminating false and misleading information concerning Zyprexa.

77.    Defendants, moreover, are not strangers to allegations of off-label promotion of one its drugs. In 2005, the Company settled a federal investigation and pleaded guilty to claims it promoted its bone loss drug, Evista, for off-label use. Lilly paid a total of $36 million in disgorged profits and fines. The Evista investigation occurred between 2002 and 2005, which overlaps the same period Zyprexa was being marketed and investigated and yet the Individual Defendants still allowed the off-label promotion of Zyprexa and the "Viva Zyprexa" campaign to continue into 2003.

78.    Lilly is also facing allegations tied to the marketing of Prozac. Many private lawsuits have been brought and settled, and the Company is currently facing class action litigation in Canada relating to the concealed side effects of Prozac, such as suicidal behavior.

79.    As recently as December 11, 2006, and even after defendants had already paid $700 million to settle 10,500 personal injury cases, defendants continued to deny that they off-label marketed Zyprexa. A December 11, 2006 article appearing in the *Indianapolis Business Journal* quoted Company spokesperson, Tarra Ryker, responding to news that insurers and third-party payors had also filed suit to be reimbursed for covering Zyprexa. She said, "[w]e firmly believe that these allegations are without merit. . . . ***We are committed to follow the highest ethical standards and to promote our medications only for approved uses.***" (Emphasis added).

80.    On December 17, 2006, *The New York Times* published an article entitled, *"Eli Lilly Said to Play Down Risk of Top Pill,"* wherein it revealed Lilly had "engaged in a decade-long effort to play down the health risks of Zyprexa, its best selling medication for schizophrenia." According to the article, defendants kept important information from doctors concerning Zyprexa's links to

- 22 -

known risk factors for diabetes – obesity and its tendency to raise blood sugar. The article stated, in

relevant part:

> *Lilly's own published data, which it told its sales representatives to play down in conversations with doctors, has shown that 30 percent of patients taking Zyprexa gain 22 pounds or more after a year on the drug, and some patients have reported gaining 100 pounds or more. But Lilly was concerned that Zyprexa's sales would be hurt if the company was more forthright about the fact that the drug might cause unmanageable weight gain or diabetes, according to the documents, which cover the period 1995 to 2004.*
>
> *         *         *
>
> *Critics, including the American Diabetes Association, have argued that Zyprexa, introduced in 1996, is more likely to cause diabetes than other widely used schizophrenia drugs.* Lilly has consistently denied such a link, and did so again on Friday in a written response to questions about the documents. The company defended Zyprexa's safety, and said the documents had been taken out of context.

[Emphasis added.]

81.    *The New York Times* December 17, 2006 article also revealed that internal Lilly

documents show that as early as 1999, defendants and more specifically, Individual Defendant

Breier, were worried about how Zyprexa's side effects might hurt sales. The article goes on to state,

in relevant part:

> **But as early as 1999, the documents show that Lilly worried that side effects from Zyprexa, whose chemical name is olanzapine, would hurt sales.**
>
> *"Olanzapine-associated weight gain and possible hyperglycemia is a major threat to the long-term success of this critically important molecule," Dr. Alan Breier wrote in a November 1999 e-mail message to two-dozen Lilly employees that announced the formation of an "executive steering committee for olanzapine-associated weight changes and hyperglycemia."* Hyperglycemia is high blood sugar.
>
> At the time Dr. Breier, who is now Lilly's chief medical officer, was the chief scientist on the Zyprexa program.

[Emphasis added.]

- 23 -

82.     In fact, a March 25, 2008 *New York Times* article entitled, "One Drug, Two Faces"

disclosed that "[i]n 2002... the Japanese government ordered Lilly to warn Japanese doctors against

giving Zyprexa to people at high risk for diabetes. But Lilly did not add a similar warning to

Zyprexa's label in the United States." Internally, Lilly executives acknowledged that the warning

had hurt Zyprexa sales in Japan.

83.     *The New York Times* December 17, 2006 article further reveals that defendants' own

internal documents, as early as 2000, showed clear "red flags" as to the safety and efficacy of

Zyprexa. The article continues on to state, in relevant part:

> In 2000, a group of diabetes doctors that Lilly had retained to consider potential links
> between Zyprexa and diabetes warned the company that *"unless we come clean on
> this, it could get much more serious than we might anticipate,"* according to an e-
> mail message from one Lilly manager to another.
>
> And in that year and 2001, the documents show, *Lilly's own marketing research
> found that psychiatrists were consistently saying that many more of their patients
> developed high blood sugar or diabetes while taking Zyprexa than other
> antipsychotic drugs.*

[Emphasis added.]

84.     Despite the information revealed in *The New York Times* December 17, 2006 article,

defendants continued to deny any link between Zyprexa and diabetes. The same article quotes a

Company spokesperson as saying, "[i]n summary, there is no scientific evidence establishing that

Zyprexa causes diabetes. . . ." However, the article continues on to reveal that defendants indeed

intentionally off-label marketed Zyprexa for unapproved use and actually chose not to give doctors

guidance on how to treat the diabetic side effect for fear it would tarnish Zyprexa's reputation.

> The documents -- which include e-mail, marketing material, sales projections and
> scientific reports -- *are replete with references to Zyprexa's importance to Lilly's
> future and the need to keep concerns about diabetes and obesity from hurting
> sales.* But that effort became increasingly difficult as doctors saw Zyprexa's side
> effects, the documents show.

- 24 -

**In 2002, for example, Lilly rejected plans to give psychiatrists guidance about how to treat diabetes, worrying that doing so would tarnish Zyprexa's reputation.** "Although M.D.'s like objective, educational materials, having our reps provide some with diabetes would further build its association to Zyprexa," a Lilly manager wrote in a March 2002 e-mail message.

But Lilly did expand its marketing to primary care physicians, who its internal studies showed were less aware of Zyprexa's side effects. *Lilly sales material encouraged representatives to promote Zyprexa as a "safe, gentle psychotropic" suitable for people with mild mental illness.*

\*     \*     \*

When it was introduced, Zyprexa was the third and most heralded of the atypical antipsychotics. With psychiatrists eager for new treatments for schizophrenia, bipolar disorder, and dementia, Zyprexa's sales soared.

*But as sales grew, reports rolled in to Lilly and drug regulators that the medicine caused massive weight gain in many patients and was associated with diabetes. For example, a California doctor reported that 8 of his 35 patients on Zyprexa had developed high blood sugar, including two who required hospitalization.*

*The documents show that Lilly encouraged its sales representatives to play down those effects when talking to doctors. In one 1998 presentation, for example, Lilly said its salespeople should be told, "Don't introduce the issue!!!"* Meanwhile, the company researched combinations of Zyprexa with several other drugs, hoping to alleviate the weight gain. But the combinations failed.

To reassure doctors, Lilly also publicly said that when it followed up with patients who had taken Zyprexa in a clinical trial for three years, it found that weight gain appeared to plateau after about nine months. *But the company did not discuss a far less reassuring finding in early 1999, disclosed in the documents, that blood sugar levels in the patients increased steadily for three years.*

*In 2000 and 2001, more warning signs emerged, the documents show. In four surveys conducted by Lilly's marketing department, the company found that 70 percent of psychiatrists polled had seen at least one of their patients develop high blood sugar or diabetes while taking Zyprexa, compared with about 20 percent for Risperdal or Seroquel. Lilly never disclosed those findings.*

By mid-2003, Lilly began to change its stance somewhat, publicly acknowledging that Zyprexa can cause severe obesity. Marketing documents make clear that by then Lilly believed it had no choice. On June 23, 2003, an internal committee reported that Zyprexa sales were "below plan" and that doctors were "switching/avoiding Zyprexa."

Since then, Lilly has acknowledged Zyprexa's effect on weight but has argued that it does not necessarily correlate to diabetes. But Zyprexa's share of antipsychotic drug

- 25 -

prescriptions is falling, and some psychiatrists say they no longer believe the information Lilly offers.

*"From my personal experience, at first my concerns about weight gain with this drug were very significantly downplayed by their field representatives," said Dr. James Phelps, a psychiatrist in Corvallis, Or.   "Their continued efforts to downplay that, I think in retrospect, was an embarrassment to the company."*

Dr. Phelps says that he tries to avoid Zyprexa because of its side effects but sometimes still prescribes it, especially when patients are acutely psychotic and considering suicide, because it works faster than other medicines.

"I wind up using it as an emergency medicine, where it's superb," he said. "But I'm trying to get my patients off of Zyprexa, not put them on."

[Emphasis added.]

85.    The next day, on December 18, 2006, *The New York Times* published an article an article entitled, *"Drug Files Show Maker Promoted Unapproved Use,"* wherein it disclosed that defendants had encouraged primary care doctors to use Zyprexa for off-label use in patients who did not have either schizophrenia or bipolar disorder.  The article went on to reveal that, from 2000 through 2003, in a campaign called "Viva Zyprexa," Eli Lilly "told its sales representatives to suggest that doctors prescribe Zyprexa to older patients with symptoms of dementia."  The article states, in relevant part:

*Eli Lilly encouraged primary care physicians to use Zyprexa, a powerful drug for schizophrenia and bipolar disorder, in patients who did not have either condition, according to internal Lilly marketing materials.*

\*        \*        \*

The marketing documents... detail a multiyear promotional campaign that Lilly began in Orlando, Fla., in late 2000. *In the campaign, called Viva Zyprexa, Lilly told its sales representatives to suggest that doctors prescribe Zyprexa to older patients with symptoms of dementia.*

\*        \*        \*

Zyprexa is not approved to treat dementia or dementia-related psychosis, and in fact carries a prominent warning from the F.D.A. that it increases the risk of death in older patients with dementia-related psychosis. Federal laws bar drug makers from promoting prescription drugs for conditions for which they have not been approved --

a practice known as off-label prescription -- although doctors can prescribe drugs to any patient they wish.

*Yet in 1999 and 2000 Lilly considered ways to convince primary care doctors that they should use Zyprexa on their patients.* In one document, an unnamed Lilly marketing executive wrote that these doctors "do treat dementia" but "do not treat bipolar; schizophrenia is handled by psychiatrists."

*As a result, "dementia should be first message," of a campaign to primary doctors, according to the document,* which appears to be part of a larger marketing presentation but is not marked more specifically.

*Later, the same document says that some primary care doctors "might prescribe outside of label."*

*    *    *

*Several psychiatrists outside the company said yesterday that they strongly disagreed with Lilly's claim. Schizophrenia is a severe disease that is almost always diagnosed when patients are in their teens or 20s. Its symptoms could not be confused with mild dementia, these doctors said.*

[Emphasis added.]

86.    The December 18, 2006 *New York Times* article clearly demonstrates that defendants were well aware of the "red flags" associated with Zyprexa. Not only did the Company's own studies corroborate clear relationships between the prescription of Zyprexa and weight-gain and the onset of diabetes (as shown in the December 17, 2006 *New York Times* article) but defendants aggressively strategized and intentionally pursued off-label marketing and promotion of Zyprexa to doctors worldwide. Despite their own internal data and despite the very same doctors they were trying to incentivize reporting these linked side effects, defendants continued to deny any culpability whatsoever. The December 18, 2006 *New York Times* article quotes Company spokesperson, Ann Nobles, as saying, "[w]e have extensive training for sales reps to assure that they provide information to the doctors that's within the scope of the prescribing information approved by the F.D.A...." The article goes on to describe promotional materials and presentations developed by defendants for use in the Viva Zyprexa campaign that were obviously contradictory to FDA

regulations, established ethical guidelines, and the Company's own public statements (including those rebutting the issues being investigated by state and federal governments and regulatory agencies). The article further states:

> As part of the ''Viva Zyprexa'' campaign, in packets for its sales representatives, Eli Lilly created the profiles of patients whom it said would be suitable candidates for Zyprexa. Representatives were told to discuss the patient profiles with doctors. One of the patients was a woman in her 20s who showed mild symptoms of schizophrenia, while another was a man in his 40s who appeared to have bipolar disorder.
>
> The third patient was ''Martha,'' a widow with adult children ''who lives independently and has been your patient for some time.'' Martha was described as being agitated and having disturbed sleep, but without the symptoms of paranoia or mania that typically marked a person with schizophrenia or bipolar disorder.
>
> *Ms. Nobles [Lilly's Vice President for Corporate Affairs] said that Lilly had actually intended Martha's profile to represent a patient with schizophrenia. But psychiatrists outside the company said this claim defied credibility, especially given Martha's age. Instead, she appeared to have mild dementia, they said.*
>
> ''It'd be very unusual for this to be a schizophrenic patient,'' said Dr. John March, chief of child and adolescent psychiatry at Duke University medical center. ''Schizophrenia is a disease of teenagers and young adults.'' Dr. March serves on Lilly's scientific advisory board.
>
> Diagnostic criteria for schizophrenia include delusions, hallucinations, disorganized and incoherent speech, and grossly disorganized behavior. They also include so-called negative symptoms like social isolation and a flattening of the voice and facial expressions.
>
> *The documents also show that Lilly encouraged primary care doctors to treat the symptoms and behaviors of schizophrenia and bipolar disorder even if the doctors had not actually diagnosed those diseases in their patients.* Lilly's market research had found that many primary care doctors did not consider themselves qualified to treat people with schizophrenia or severe bipolar disorder.
>
> The campaign was successful, the documents show. By March 2001, about three months after the start of Viva Zyprexa, the campaign had led to 49,000 new prescriptions, according to a presentation that Michael Bandick, the brand manager for Zyprexa, gave at a national meeting of Lilly sales representatives in Dallas. Mr. Bandick did not say how many of those new prescriptions were for older patients with dementia.

Over all, sales of Zyprexa doubled between 1999 and 2002, rising from $1.5 billion to $3 billion in the United States. *In 2002, the company changed the name of the primary care campaign to "Zyprexa Limitless" and began to focus on people with mild bipolar disorder who had previously been diagnosed as depressed — even though Zyprexa has been approved only for the treatment of mania in bipolar disorder, not depression.*

In a 2002 guide for representatives, Lilly presented the profile of "Donna," a single mother in her mid-30s whose "chief complaint is, 'I feel so anxious and irritable lately.' "Several doctors' appointments earlier, she was "talkative, elated, and reported little need for sleep."

Lilly's efforts to promote Zyprexa to primary care doctors disturbed some physicians, the documents show. *In August 2001, a doctor in Virginia sent an e-mail message to Lilly and the F.D.A., complaining about a presentation from a Lilly sales representative who had discussed the hypothetical Martha with him.*

The representative "presented an elderly female patient who was presented to her physician by her family complaining of insomnia, agitation, slight confusion, and had no physical finding to explain her state," the doctor wrote. The representative then suggested that the doctor prescribe Zyprexa.

*"I inquired what Zyprexa was indicated for she then indicated that many physicians might prescribe an antipsychotic for this patient. I then asked for her package insert and read to her that her product was indicated for schizophrenia and bipolar mania — neither of which the presented patient had been diagnosed with," the doctor wrote.*

*He added that he had never contacted the F.D.A. before but was "genuinely concerned about the promotion of this powerful drug to my peer community of primary care physicians outside of its approved and intended purpose."*

*     *     *

The "Viva Zyprexa" documents also provide color about Lilly's efforts to motivate its sales force as they marketed Zyprexa -- whose generic name is olanzapine -- to primary care doctors.

At the 2001 meeting in Dallas with Zyprexa sales representatives, Mr. Bandick praised 16 representatives by name for the number of prescriptions they had convinced doctors to write, according to a script prepared in advance of the meeting. *More than 100 other representatives had convinced doctors to write at least 16 extra prescriptions and thus "maxed out on a pretty sweet incentive," he said.*

*"Olanzapine is the molecule that keeps on giving," Mr. Bandick said.*

[Emphasis added.]

- 29 -

87.    Further, an October 18, 2005 *Associated Press* article entitled, *"Dementia Drugs Can Increase Death Risks* concluded that:

> ...drugs often used to treat elderly patients with dementia-related aggression and delusions can raise their risk of death, according to a study that reinforces new warning labels required on medications.  The researchers pooled results of 15 previous studies on drugs known as atypical anti-psychotics and sold under the brand names Zyprexa, Risperdal, Seroquel and Abilify.  Among more than 5,000 elderly dementia patients, those taking any of the drugs faced a 54 percent increased risk of dying within 12 weeks of starting the medication, compared with patients taking dummy pills.  There were 118 deaths among the 3,353 drug users versus 40 in the 1,757-patient placebo group, or 3.5 percent compared with 2.3 percent.  The risks were similar for each of the drugs...The study appears in Wednesday's Journal of the American Medical Association.

88.    The off-label promotion of Zyprexa to treat elderly patients with dementia-related symptoms, such as those illustrated in the materials presented to the Virginia doctor concerning the hypothetical "Martha" patient mentioned in the December 18, 2006 *New York Times* article, is particularly egregious given the results of a study conducted by defendants in 1995 (before Zyprexa was even initially approved by the FDA).  The study revealed that olanzapine (the active ingredient in Zyprexa) was ineffective in treating such conditions as dementia and Alzheimer's.  Regardless, as demonstrated by the "Martha" materials, defendants intentionally off-label promoted Zyprexa for symptoms of dementia and Alzheimer's.

## Defendants Continued Refusal to Disclose
## Known Dangerous Side Effects

89.    Defendants have shown patterns of both failing to disclose adverse side effects of Zyprexa and using misleading promotional and marketing materials.  On November 17, 1996, less than seven weeks after Zyprexa had been approved by the FDA, the FDA sent a letter to Lilly about labeling pieces and promotional activities considered to be "false or misleading, and in violation of the Federal Food, Drug, and Cosmetic Act" by the Division of Drug Marketing, Advertising, and Communications ("DDMAC").

- 30 -

90.     The FDA's letter took specific issue with statements made by Individual Defendant Tollefson on an October 1, 1996 teleconference (only two days after Zyprexa was approved). The letter states, in relevant part:

> When asked a question about weight gain, Dr. Tollefson's response misleadingly turned an adverse event into a therapeutic benefit. He states, "So we went back and analyzed our data and saw that the vast majority of weight gain reported initially as an adverse event, in fact, was weight gain occurring in patients who had baseline before starting treatment, had been below their ideal body weight. So we really look at this in the majority of patients as being part of a therapeutic recovery rather than an adverse event. That data I think was fairly compelling because it was included in our labeling."

91.     The FDA also took issue with Zyprexa's labeling pieces.  The FDA stated that promotional campaign lacked "appropriate balance, thereby creating a misleading message about Zyprexa" in that the pieces "emphasize efficacy but do not provide sufficient balance relating to adverse events and cautionary information."  In addition, the materials did not "adequately or prominently discuss several important adverse events specifically selected for emphasis in the approved labeling," including weight gain.  In conclusion, the letter stated that the labeling pieces "present a misleading impression of Zyprexa as a superior, highly effective, virtually free of side effects, easy to use product.  This impression is contrary to the approved labeling."

92.     The information on weight gain was included in the approved Zyprexa labeling, but as an adverse event, not a therapeutic benefit.  Since the product was approved at the time of the October 1, 1996, teleconference, Tollefson knew or should have known what information the approved labeling contained and in what section it appeared.  Further, Tollefson's misrepresentations about weight gain on the phone conference were contradicted by Lilly's own study's conclusion. Tollefson claimed that the weight gain was mostly observed in patients whose weights were abnormally low before taking Zyprexa, hence the alleged therapeutic effect.  However, Lilly's own study in 1993 concluded that "weight gain was evident and uniform in all subjects, with an average

weight gain of nearly 9 pounds over the study duration." Tollefson's interactive telephone conference is an eerie and early illustration of the lies, misrepresentations and data manipulations concerning the risks and benefits of Zyprexa that defendants have intentionally endorsed, encouraged and have continued to report for more than a decade.

93.     Moreover, the FDA complained that the October 1, 1996 teleconference had "presented a misleading impression of Zyprexa as a superior, highly effective, virtually free of side effects, easy to use product." Tollefson had said that olanzapine had no Parkinsons-like side effects: "We're very pleased that the labeling in the U.S. will show by objective rating scales that both Parkinsons-like side effects and restlessness or Acathisia, the incidence across all doses of Zyprexa was comparable to placebo. That is essentially this drug did not induce persistent Parkinsonian problems." And: "[W]e've been able to show that there is a statistically and significantly lower incidence of this neurological [Tardive Diskinesia] side effect with Zyprexa than with conventional drugs." Not only was this a clearly deceptive analysis of the clinical trial results, years later Lilly admitted on its "Patient Information Sheet Revised 04/2005" for Zyprexa that it could "cause serious problems such as . . . A movement problem called tardive dyskinesia (TD)."

94.     In the October 1, 1996 conference call, Tollefson announced that prolactin elimination would not be a problem: "In our labeling it will be clear that Zyprexa is not associated with these persistent, high long term elevations of prolactin . . ." As a major selling point, Tollefson pointed out that olanzapine was distinct from its competitors because it required no blood monitoring.

> With some of the other agents, such as Clozapine or clozaril that you may be familiar with, of course there are prerequisites for blood monitoring on a weekly basis because of some of the safety concerns with those drugs. Of course this is very troublesome to patients and very costly. We're very pleased that we have no requirements for any type of blood monitoring with Zyprexa.

95.     In fact, Lilly believed as early as 1996 that blood glucose monitoring should be recommended for patients on Zyprexa.  Nevertheless, they allowed their spokesman, Tollefson, to distinguish Zyprexa from its competitors as a treatment option that did not require monitoring, leaving the impression that Zyprexa was less expensive to prescribe than other antipsychotics because it did not require blood monitoring.

96.     Tollefson continued:

Lastly I think particularly important to the prescriber and patient, unlike make [sic] of the anti-psychotics currently in the marketplace that require the prescriber to start with very low doses that are subtherapeutic because of safety concerns then gradually work the patient into a therapeutic range where they can begin to get benefit, Zyprexa will have a starting does [sic] on day one of ten milligrams, which is also an effective therapeutic dose.  So the bottom line is, there is no need for this historic, mandatory titration of drug.  We can start with the therapeutically effective does [sic] on day one.

By contrast, however, Lilly's official label says that patients should commence with 2.5 to 5 mg on day one.

97.     From the very beginning of Zyprexa's marketing, and with the full knowledge of Lilly's directors, highest executives, scientists and medical officers, Lilly engaged in systematic overpromotion of Zyprexa, by exaggerating its benefits, especially in off-label use, and by understating its risks.

98.     Defendants endorsed, adopted, and repeated Tollefson's misleading statements to doctors about Zyprexa.  An October 1, 1996 press release entitled, "Lilly's Zyprexa (olanzapine) Cleared for Marketing for Treatment of Psychotic Disorders" issued by Lilly press spokesperson, Lori Roberts, defendants said that Zyprexa had "no requirement for blood monitoring and a therapeutic starting dose without a requirement for titration for most patients," quoting Tollefson, Lilly's then-Vice President of Research Laboratories and "head of the olanzapine heavyweight team."  Moreover, the press release promised that "Zyprexa patients will not have to submit to weekly blood monitoring tests."

- 33 -

99.     Over the years, the Individual Defendants have boasted of the Company's strict purported adherence to strict ethical standards and guidelines. Eli Lilly's Annual Report filed in Form 10-K on March 1, 2006 touted that the Company had adopted a "code of ethics that complies with the applicable SEC and New York Stock Exchange requirements" and that an ethical code was set forth in, among other places, the "Red Book." According to the Company's website, the Red Book is a "comprehensive code of ethical and legal business conduct applicable to all employees worldwide and to [Lilly's] Board of Directors." The Red Book contains a section entitled, *"Ethical Interactions with Health Care Providers and the Promotion of Pharmaceutical Products"* wherein it states, in relevant part:

> Employees must comply with all laws, regulations, industry codes of practice, company policies, and government and court orders and decrees that govern the promotion of Lilly medicines and medical devices. Employees must also behave ethically in dealings with health care providers.

100.    Within the same section of the Red Book, the Company outlines in relevant part, that employees involved in sales and marketing activities must (among other things):

(a)     "Promote Lilly products only for their locally approved indications" and

(b)     "Not proactively discuss information about unapproved new products or off-label information."

101.    Considering the FDA and other state and federal government agencies' aggressive monitoring and enforcement stance, the fallout in the pharmaceutical industry concerning off-label promotion amongst its peers, and the Company's own purported attention to ethical conduct, the Individual Defendants intentionally disregarded the potential risk and regulatory liability of substantial and serious losses, associated with the off-label promotion of Zyprexa and the concealment of the possible dangerous side effects of the drug, to the Company and its shareholders.

102.    An analysis of the number of Adverse Event Reports ("AERs") over the first four years of Zyprexa's market life, shows nearly 200 AERs after 2 years, 400 AERs after 3 years, and nearly 600 diabetes-related AERs in Zyprexa's fourth year of distribution. These AERs were reported to the FDA and known to defendants.

103.    The number of reports of AERs is a very conservative representation of the actual number of AERs actually occurring. It is well understood that adverse drug event reports represent between 1% and 10% of the total estimated population of all complications. *See* "Physician Knowledge, Attitude and Behavior Related to Reporting," *Archives of Internal Medicine*, 1988: 148; 1589-1592; "Underreporting of Hemorrhagic Stroke Associated with Phenylpropanolamine," 286 (24) *JAMA* (2001); "Rhode Island Physician's Recognition and Reporting of Adverse Drug Reactions," *RI Medical Journal* 1987: 70:311-316.

104.    The reality of under-reporting is due mainly to the fact that the adverse event reporting system in the U.S. is a voluntary system (*i.e.*, doctors are under no obligation to report an adverse event). As a result, the number of reported adverse events must be multiplied by a factor of between 10 and 100 to arrive at an accurate estimate.

105.    After adding the unreported adverse events for Zyprexa to the above figures, the true number of diabetes-related adverse events from market introduction in 1996 to year end 2000 is estimated to be as low as 6,000 and as high as 60,000 – a staggeringly high number considering the indications being treated and the availability of far safer alternatives.

106.    Defendants did not entirely ignore the reports of adverse events concerning diabetes and elevated glucose levels. Rather, defendants implemented marketing strategies that blamed diabetes and hyperglycemia on the schizophrenic population at large, rather than on their respective drug. Despite the fact that the Company's own internal studies and adverse event data revealed that

- 35 -

its respective drug increased the risk of diabetes, even among schizophrenics, defendants intentionally refused to adequately warn patients of this known risk. At the same time, defendants were affirmatively misrepresenting that the incidence of diabetes associated with their respective drug was due only to background incidence inherent in the schizophrenic population.

## The FDA Required Defendants to Warn of Treatment-Emergent Diabetes and Hyperglycemia

107.    On September 11, 2003, the FDA advised defendants of what they had known for years: "epidemiological studies suggest an increased risk of treatment-emergent hyperglycemia-related adverse events in patients treated with atypical antipsychotics." The FDA's conclusions were based on "an extensive review of data available for patients treated with atypical antipsychotics over a number of years." The FDA requested class-labeling for all atpyical antipsychotics to include a warning about hyperglycemia-related adverse events. The FDA concluded that atypicals create a risk of hyperglycemia, despite defendants' repeated claims to the contrary.

108.    The FDA included its "[m]onitoring recommendations" as follows:

(a)    Patients with an established diagnosis of diabetes mellitus who are started on atypical antipsychotics should be monitored regularly for worsening of glucose control.

(b)    Patients with risk factors for diabetes mellitus (*e.g.* obesity, family history of diabetes) who are starting treatment with atypical antipsychotics should undergo fasting blood glucose testing at the beginning of treatment and periodically during treatment.

(c)    Any patient treated with atypical antipsychotics should be monitored for symptoms of hyperglycemia including polydipsia, polyuria, polyphagia, and weakness; and patients who develop symptoms of hyperglycemia during treatment with atypical antipsychotics should undergo fasting blood glucose testing.

109.   The FDA required defendants to adopt the following "WARNING" about hyperglycemia and diabetes mellitus in their respective labels.

### Hyperglycemia and Diabetes Mellitus

Hyperglycemia, in some cases extreme and associated with ketoacidosis or hyperosmolar coma or death, has been reported in patients treated with atypical antipsychotics. Assessment of the relationship between atypical antipsychotic use and glucose abnormalities is complicated by the possibility of an increased background risk of diabetes mellitus in patients with schizophrenia and the increasing incidence of diabetes mellitus in the general population. Given these confounders, the relationship between atypical antipsychotic use and hyperglycemia-related adverse events is not completely understood. However, epidemiologic studies suggest an increased risk of treatment emergent hyperglycemia-related adverse events in patients treated with atypical antipsychotics. Precise risk estimates for hyperglycemia-related adverse events in patients treated with atypical antipsychotics are not available.

Patients with an established diagnosis of diabetes mellitus who are started on atypical antipsychotics should be monitored regularly for worsening of glucose control. Patients with risk factors for diabetes mellitus (e.g., obesity, family history of diabetes) who are starting treatment with atypical antipsychotics should undergo fasting blood glucose testing at the beginning of treatment and periodically during treatment. Any patient treated with atypical antipsychotics should be monitored for symptoms of hyperglycemia including polydipsia, polyuria, polyphagia, and weakness. Patients who develop symptoms of hyperglycemia during treatment with atypical antipsychotics should undergo fasting blood glucose testing. In some cases, hyperglycemia has resolved when the atypical antipsychotic was discontinued; however, some patients required continuation of anti-diabetic treatment despite discontinuation of the suspect drug.

110.   Despite the FDA's mandate that defendants immediately warn of the dangers described above, defendants' "Dear Doctor Letter" did not go out until March 1, 2004. The letter came from Dr. Paul Eisenberg, Vice President, Global Product Safety of Lilly. Again, defendants hid the Company among its competitors by, among other things, reminding physicians that "all manufacturers" had to adopt the same warning. Lilly's letter made no mention of the increased and unique risks posed by Zyprexa.

111.    According to a March 6, 2008 article in *The New York Times*, "[o]nly last year, under pressure from the F.D.A., did the [C]ompany acknowledge in the label that Zyprexa appears to have bigger risks for high blood sugar than other medications for schizophrenia."

**2004: Diabetes Consensus Statement**

112.    In February 2004, the American Diabetes Association, the American Psychiatric Association, the American Association of Clinical Endocrinologists, and the North American Association for the Study for Obesity issued a Consensus Development Statement (the "Consensus Statement") regarding antipsychotic drugs, obesity, and diabetes.  Among other things, the Consensus Statement observed that there is "considerable evidence" that treatment with atypical antipsychotics can cause a rapid increase in body weight.  The Consensus Statement also observed that numerous case reports had documented the onset and exacerbation of diabetes, including the occurrence of hyperglycemic crises, following the initiation of therapy with many atypical antipsychotics, including Zyprexa. Because of the grave prognosis associated with diabetes, atypical antipsychotics that both cause the onset of diabetes and exacerbate the complications associated with diabetes in those predisposed to its development pose very serious public health risks - particularly when the medical community is not adequately warned of these side effects.

113.    The Consensus Statement stated, in relevant part:

(a)    The Risk of Diabetes Affects Drug Choice: "[T]he risks of obesity, diabetes and dyslipidemia have considerable clinical implications in this patient population and should . . .influence drug choice."

(b)    Monitoring is Necessary to Prevent Against Diabetes and Diabetes Related Injuries: "Given the serious health risks, patients taking SGAs [second generation anti-psychotics] should receive appropriate baseline screening and ongoing monitoring."

(c)    Patients Must Be Informed: "Health professionals, patients, family members, and caregivers should be aware of the signs and symptoms of diabetes and, especially those associated with the acute decompensation of diabetes such as DKA [diabetic ketoacidosis]."

**CATIE Study**

114.    In September of 2005, the public perception of atypical antipsychotics created by defendants was dealt a crushing blow when the results of the first phase of the Clinical Antipsychotic Trials of Intervention Effectiveness ("CATIE") study was published in the New England Journal of Medicine (the "CATIE Study"). The CATIE Study was initiated by the National Institute of Mental Health ("NIMH") to compare the relative safety and efficacy of second generation (atypical) antipsychotic drugs to first generation antipsychotics. The study was conducted between January 2001 and December 2004 at multiple clinical sites across the United States. Critically, the CATIE Study was not financed by the pharmaceutical industry.

115.    The CATIE Study grew out of concerns that had emerged regarding the value and safety of second generation anti-psychotics.

116.    Earlier clinical trials had indicated that Clozapine was more effective than first-generation drugs. However, the issue of whether the other atypicals were more effective than older, cheaper drugs remained largely unanswered.

117.    Therefore, the NIMH undertook a multi-site, double-blind comparison between an older drug, perphenazine, and the newer drugs, including Zyprexa; Clozapine was omitted because it had already been observed to have superior efficacy.

118.    The CATIE Study's results were revolutionary. Regarding efficacy, the study's authors concluded that Zyprexa were no more effective than the first generation antipsychotic, perphenazine, in treating schizophrenia. *Further, about two thirds of the Zyprexa patients discontinued their medication prior to the end of the 18-month study period because of intolerable*

*side effects*. In addition, the times to discontinuation because of intolerable side effects, including movement disorders, were similar among all the groups. In other words, the CATIE Study proves what defendants each knew since launching Zyprexa, that it is no more effective in treating schizophrenia, and no safer, than first generation antipsychotics.

## DEMAND WOULD BE FUTILE

119. Plaintiff brings this action derivatively in the right and for the benefit of Lilly to redress injuries suffered and to be suffered by Lilly as a result of the breaches of fiduciary duty by defendants and/or violations of the federal securities laws.

120. Plaintiff will adequately and fairly represent the interests of Lilly and its shareholders in enforcing and prosecuting its rights. Plaintiff has retained competent counsel, experienced in derivative litigation of this nature, to prosecute this action.

121. Plaintiff is a holder of Lilly common stock and was a holder of Company common stock during the period in which defendants' wrongful course of conduct alleged herein was occurring through the present.

122. As a result of the facts set forth herein, plaintiff has not made a demand upon the Company's Board of Directors to institute this action against defendants. Such a demand would be a futile and useless act because a majority of the Director Defendants are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action for the following reasons:

(a)    The current Lilly Board of Directors consists of the following thirteen individuals: Sidney Taurel, John C. Lechleiter, Sir Winfried Bischoff, J. Michael Cook, Martin S. Feldstein, George M.C. Fisher, J. Erik Fyrwald, Alfred G. Gilman, Karen N. Horn, Ellen R. Marram, Franklyn G. Prendergast, Kathi P. Seifert, and Michael L. Eskew;

- 40 -

(b)      Since Director Defendants Taurel's and Lechleiter's principal occupations is their employment with the Company, pursuant to which they received and continue to receive substantial compensation and benefits, they cannot be considered independent;

(c)      As demonstrated herein, the Individual Defendants intentionally disregarded the ongoing pattern of the lack of compliance with legal and ethical requirements concerning the marketing and sale of Zyprexa, as well as the safety and other public disclosure violations concerning Zyprexa. The Individual Defendants, moreover, intentionally failed to comply with those safety, marketing, and other applicable legal requirements, despite the fact the Company could and would face severe consequences and penalties;

(d)      Defendants knew about or consciously ignored several "red flags" of wrong doing regarding the Company's marketing of Zyprexa including, among others plead in this Complaint, the following:

(i)      On November 17, 1996, the FDA warned Lilly about its labeling and promotional activities in connection with Zyprexa less than seven weeks after the FDA had approved its use;

(ii)      Lilly internal documents generated in 1999 from its now Chief Medical Officer that characterized weight gain and diabetes as a "major threat" to the success of Zyprexa;

(iii)      Lilly internal documents generated during 1995-2004, which urged sales staff to play down the known risk that Zyprexa users could experience substantial weight gain;

(iv)      In 2000, diabetes experts Lilly retained warned the Company, among other things, that "unless we come clean on this, it could get much more serious than might anticipate;"

- 41 -

(v)     In 2000-2001, four Lilly marketing research studies showed that psychiatrists were reporting that Zyprexa users were more prone to developing diabetes than patients on other anti-psychotic medications;

(vi)    In 2002, Lilly decided to reject advising psychiatrists about diabetes connected to Zyprexa usage;

(vii)   The Japanese government warned Lilly in 2002 against marketing Zyprexa to individuals who ran a high risk of contracting diabetes;

(viii)  On September 11, 2003, the FDA demanded that Lilly warn patients about Zyprexa's side effects based, in part, on Lilly's own internal data;

(ix)    Zyprexa AERs showed substantial growth in diabetes-related illnesses;

(x)     Warnings from the American Diabetes Association in a 2004 consensus study showed that Zyprexa was more likely to cause the onset of diabetes than other anti-schizophrenia medications;

(xi)    Lilly paid $36 million to the federal government in connection with the improper marketing of the drug Evista for off-label usage during 2002-2005; and

(xii)   Publication of the September 2005 CATIE Study showing that Zyprexa was no more effective than the first-generation anti-psychotic medications.

(e)     The Director Defendants' willful ignorance of these and other plead "red flag" warnings represent a systemic pattern of wrongful conduct throughout the relevant period and, therefore, a lack of good faith on the part of the Individual Defendants, and has exposed Lilly to costly and continued litigation and investigations;

(f)     All of the Director Defendants face a substantial likelihood of non-exculpated liability in this action because of their failure, as directors, to assure that a reliable system of internal

controls was in place and functioning effectively. The dramatic breakdowns and gaps in those controls were so widespread and systemic that the entire Board faces substantial exposure to liability. These directors either knew or should have known that violations of law and established ethical guidelines were occurring and took no steps in a good faith effort to prevent or remedy that situation, proximately causing billions of dollars of losses for the Company;

(g)     Any suit brought about by the Company's current Board members, to remedy the wrongs alleged herein, would likely subject the Individual Defendants to additional lawsuits being filed against one or more of the Individual Defendants. As a result, the Director Defendants are conflicted in making any supposedly independent determination whether to sue themselves;

(h)     In fact, Lilly has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein. The Director Defendants, however, have yet to file a single lawsuit against themselves or any others who were responsible for the wrongful conduct so as to recover those losses for the Company; and

(i)     If the Director Defendants were to bring this derivative action against themselves, they would expose their own recklessness and misconduct which underlies the allegations against the Company contained in the class action complaints for violations of the federal securities laws which have been brought against the Company and many of defendants herein. Such admissions would impair the Company's and their defense of the securities class action and greatly increase the probability of their personal liability in the class actions, in an amount likely to be in excess of any insurance coverage available to defendants.

123.     The Company's decision to form a self-described "special litigation committee" (the "SLC") to purportedly investigate the wrongdoing alleged herein itself is an  admission that a majority of the Director Defendants who compose the Board of Directors are incapable of exercising

- 43 -

requisite independent business judgment and therefore demand is excused. Moreover, since the

Company has not disclosed the SLC's authority to act on its behalf, the nature or scope of its work,

or even which directors constitute the SLC, the formation of the SLC is irrelevant to the

determination of demand futility or the outcome of this lawsuit. Moreover, it is clear that the Board

of Directors has pre-judged the merits of the underlying claims in this action and therefore none of

the Individual Defendants, including those serving on the SLC, can be expected to ever prosecute

them vigorously. On February 29, 2008, the Company issued its annual report with the Securities

and Exchange Commission on Form 10-K, which stated among other things, that a previously filed

shareholder derivative action is "without merit" and that the Company is "prepared to defend against

it vigorously."

### THE INDIVIDUAL DEFENDANTS' BREACHES OF DUTY

124.    The Individual Defendants, and each of them, violated and breached their fiduciary

duties of loyalty and supervision.

125.    Based on their duties to the Company, each of the Individual Defendants has

intentionally breached his or her fiduciary obligations by permitting the wrongful conduct set forth

above to occur and continue. As detailed above, the Individual Defendants failed to keep the

Company in compliance with applicable regulatory requirements, the Company's own internal

policies and other internal controls. The Individual Defendants, as alleged above, had intentionally

failed to detect the wrongful conduct in which management was engaged.

126.    The Officer Defendants, as a result of their executive duties during the times relevant

hereto, had direct knowledge of Lilly's activities with respect to the marketing of Zyprexa, Evista,

and Prozac. Each of them, through actions taken in their respective executive roles and functions as

alleged herein, acted deliberately and in bad faith or recklessly to cause the illegal and wrongful

actions by the Company alleged herein, in violation of their fiduciary duty of loyalty.

127.    As alleged above, the Director Defendants intentionally breached their fiduciary obligations to exercise loyalty in the management and administration of the affairs of the Company and in the use and preservation of its property and assets. The Director Defendants owed Lilly the duty of full and candid disclosure of all material facts related thereto.

128.    The Individual Defendants' conduct exposed the Company to substantial risk of damage, including regulatory and private investigations and litigation. As set forth below, the Company has incurred and may continue to incur substantial damages as a result of these governmental and private claims. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

## HARM TO LILLY AND ITS SHAREHOLDERS

129.    Because of the Individual Defendants' breaches of fiduciary duty, Lilly has suffered financial harm, including substantial payments to settle Zyprexa personal injury and death claims. The Company is exposed to potential damages arising out of continuing governmental investigations and proceedings, as set forth above, and continuing private actions. Lilly has stated in filings with the SEC that it is unable to estimate the potential liabilities it faces, and that these liabilities could affect Lilly's consolidated results of operations, liquidity, and financial position.

## COUNT I

### Against the Individual Defendants
### for Breach of Fiduciary Duty

130.    Plaintiff repeats and re-alleges each of the allegations set forth above as if fully set forth herein.

131.    Based upon the allegations set forth in the preceding paragraphs, the Individual Defendants intentionally breached their fiduciary duties and aided and abetted one another in breaching their fiduciary duties to the Company.

132.    Those Individual Defendants who participated in or had knowledge of the "Viva Zyprexa" off-label marketing campaign and/or misrepresentation to the FDA, the medical community, and the public regarding the metabolic risks of Zyprexa, as well as the similar conduct relating to Evista and Prozac alleged above, acted intentionally, thereby breaching their fiduciary duty of loyalty to the Company.

133.    The Individual Defendants who were directors and/or senior executive officers of the Company abused the trust reposed in them by virtue of their positions and breached their fiduciary duty of loyalty by abdicating their duty of oversight.  As the result of their sustained and systematic failure to exercise oversight, the Individual Defendants caused or allowed the Company's business to be conducted in violation of the extensive legal requirements and regulations known to them, including prohibitions against off-label marketing and promotion, Medicaid rebate requirements (including "best price" reporting requirements), and prohibitions against the submission of false claims, as well as duties to provide accurate and truthful information concerning adverse effects of marketed pharmaceutical products.

134.    By reason of the foregoing, the Individual Defendants have proximately caused injury to the Company, which has been and will continue to be substantially damaged as the foreseeable result of their wrongful acts and omissions.

**WHEREFORE,** plaintiff prays for judgment as follows:

A.    Declaring that the directors and officers named as Individual Defendants herein have breached their fiduciary duties as alleged herein;

B.    Requiring the Individual Defendants to pay to the Company the amounts by which it has been damaged or will be damaged by reason of the conduct complained of herein;

- 46 -

C.    Requiring the Individual Defendants to remit to the Company all of their salaries and other compensation received for the periods when they breached their duties;

D.    Ordering that the Individual Defendants and those under their supervision and control refrain from the commission of such further unlawful activities as are alleged herein and implement comprehensive corrective measures including a system of internal controls and procedures sufficient to prevent the repetition of the acts complained of herein which will rectify all such wrongs as have been committed and prevent their recurrence;

E.    Awarding plaintiff reasonable attorneys' fees, expert fees and other reasonable costs and expenses; and

F.    Granting such other and further relief as this Court may deem just and proper.

DATED:  April 14, 2008

COUGHLIN STOIA GELLER RUDMAN &
ROBBINS LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD
MARIO ALBA, JR.

SAMUEL H. RUDMAN

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

RIGRODSKY & LONG, P.A.
SETH D. RIGRODSKY
BRIAN D. LONG
919 N. Market Street, Suite 980
Wilmington, DE 19801
Telephone:  302/295-5310

Attorneys for Plaintiff

- 47 -

VANOVERBEKE MICHAUD & TIMMONY, P.C.
MICHAEL J. VANOVERBEKE
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI 48201
Telephone: 313/578-1200
313/578-1201 (fax)

Additional Counsel for Plaintiff

<u>VERIFICATION</u>

I, SAMUEL H. RUDMAN, hereby declare as follows:

1.      I am a member of the law firm of Coughlin Stoia Geller Rudman & Robbins, LLP, counsel for plaintiff in the above-entitled action. I have read the foregoing complaint and know the contents thereof. I am informed and believe the matters therein are true and on that ground allege that the matters stated therein are true.

2.      I make this Verification because plaintiff is absent from the County of Suffolk where I maintain my office.

Executed this 14th day of April, 2007 at Melville, New York.

SAMUEL H. RUDMAN